

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

20-24201-CV-WILLIAMS/MCALILEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* AKW ENTERPRISES, LLC., <br><br> *Plaintiff,* <br><br> v. <br><br> SHOW CIGARS INC., FADI ZAHRAN, SALMA ZAHRAN, ABDALLAH NADA, J & D ENTERPRISES INC., MECCA ENTERPRISES INC., L A TOBACCO INC., LPR TOBACCO IMPORTERS INC., RAO TOBACCO IMPORTS INC., FLORIDA IMPORT EXPORT SERVICES INC., PARAMOUNT IMPORTS LLC, PRESTIGE TOBACCO INC., SOUTH FLORIDA IMPORT & EXPORT CORP., L.J. IMPORTS LLC, LAZARA ORS, ROGER ORS, ROLY ORS, ABIEL ORS, LUCIA VALDIVIA ARCILA, GADIEL GOMEZ, MICHAEL GARCIA, JOSE LUIS CANO, JOSE CARLOS GONZALEZ, DANIEL SINCLAIR JR., DAVID CLEMENT, LISA HARPER, DURFORT HOLDINGS S.A., EMILIO ALCEDO REYES VARGAS, MARLON IVAN REYES ESTEVEZ, EMIMAR S.A., PLATAFORMA ARCOIRIS S.A., AND JOHN DOES 1-20, <br><br> *Defendants.* | Civil Action No.: _____ <br><br><br><br> FALSE CLAIMS ACT COMPLAINT <br><br><br> **FILED UNDER SEAL** <br><br>  |

i

*Qui tam* plaintiff and Relator AKW Enterprises, LLC ("AKW") through its undersigned attorneys, hereby brings this action on behalf of the United States of America against:

- Show Cigars Inc.;
- Fadi Zahran;
- Salma Zahran;
- Abdallah Nada;
- J & D Enterprises Inc.;
- Mecca Enterprises Inc.;
- L A Tobacco Inc.;
- LPR Tobacco Importers Inc.;
- Rao Tobacco Imports Inc.;
- Florida Import Export Services Inc.;
- Paramount Imports LLC;
- Prestige Tobacco Inc.;
- South Florida Import & Export Corp.;
- LJ. Imports LLC;
- Lazara Ors;
- Roger Ors;

- Roly Ors;
- Abiel Ors;
- Lucia Valdivia Arcila;
- Gadiel Gomez;
- Michael Garcia;
- Jose Luis Cano;
- Jose Carlos Gonzalez;
- Daniel Sinclair Jr.;
- David Clement;
- Lisa Harper;
- Durfort Holdings S.A.;
- Emilio Alcedo Reyes Vargas;
- Marlon Ivan Reyes Estevez
- Emimar S.A.;
- Plataforma Arcoiris S.A.; and
- John Does 1-20.

The claims asserted in this Complaint are based on Defendants evading payments due under: (a) the United States Department of Agriculture Tobacco Transition Payment Program; (b) the United States Food and Drug Administration tobacco user fees; and (c) Federal Excise Tax collected by Customs and Border Protection as an import duty.  The claims are based on the facts and information set forth below unless otherwise stated.

NATURE OF THE ACTION ................................................................................................ 1

PARTIES .............................................................................................................................. 3

    A.  Relator – AKW Enterprises, LLC ................................................................... 3

    B.  Cigar Seller Defendants .................................................................................. 3

    C.  Importer Defendants ....................................................................................... 4

    D.  Manufacturer Defendants ............................................................................... 8

JURISDICTION AND VENUE ......................................................................................... 10

FACTS ................................................................................................................................ 11

I.       GOVERNING LAWS ..................................................................................... 11

    A.  USDA Tobacco Transition Program Fees; 2005-2014 ................................ 11

    B.  FDA User Fees; 2016 – Present .................................................................... 13

    C.  Federal Excise Taxes on Cigars ................................................................... 15

II.      THE PRODUCTION OF LARGE CIGARS ................................................. 17

III.    DEFENDANTS' UNLAWFUL EVASION OF FDA USER FEES, TTPP FEES, AND FET ............................................................................................................ 19

    A.  Defendants Fraudulently Evade FDA User Fees by Rotating Importers ...... 19

    B.  Defendants Fraudulently Evade TTPP and FDA User Fees by Cheating on FET and Fraudulently Reporting Artificially Low Prices .................................. 20

        1.  False sales create false prices ................................................................. 21

        2.  Excluded packaging and shipping expenses .......................................... 22

        3.  Fake prices ............................................................................................. 22

    C.  The Scale of the Evasion .............................................................................. 23

IV.    THE IMPORTER DEFENDANTS' ROLE .................................................... 23

    A.  Rotating Importers ........................................................................................ 24

    B.  Fake Prices ................................................................................................... 24

    C.  Knowledge and Interrelation ....................................................................... 25

V.      THE MANUFACTURER DEFENDANTS' ROLE ....................................... 27

    A.  Manufacturer Defendant Knowledge .......................................................... 27

    B.  Manufacturer Defendants Help Establish Importer Cycling ....................... 28

    C.  Manufacturer Defendants Actively Participate in the Scheme .................... 30

    D.  Manufacturer Defendants Take Steps to Obscure and Hide the Scheme ..... 31

CAUSES OF ACTION ...................................................................................................... 32

iii

## NATURE OF THE ACTION

1.      Relator sues Defendants to recover treble damages and civil penalties on behalf of the United States of America for Defendants' several schemes to evade and cheat on the payment of various fees and taxes collected as import duties owed to, and imposed or collected by, the United States Department of Agriculture ("USDA"), the United States Food and Drug Administration ("FDA"), Customs and Border Protection ("CBP"), and/or the Tobacco Tax & Trade Bureau ("TTB").

2.      Defendants' motivation appears simple: by evading the required fees and taxes, Defendants improperly and unfairly inflate the income of their cigar manufacturing, import, and distribution businesses.

3.      Defendants engaged in these widespread frauds against the United States in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").

4.      The schemes described here are "reverse false claims" in that these monies were owed to the government and not paid.

5.      The cigar import market is subject to various United States government regulations which require the payment of various fees and taxes.

6.      Large cigar importers and distributors are required to pay several different sets of fees and taxes.

7.      As relevant here, the first such fee that cigar importers and distributors were responsible for were assessments under what was known as the USDA Tobacco Transition Payment Program ("TTPP"). It was effective between approximately 2005 and September 30, 2014. The calculation of the amounts owed by cigar importers under TTPP was based in part on prior year Federal Excise Tax payments.

1

8.      Starting in 2016, FDA expanded its existing tobacco user fee system to include large cigars.

9.      Other than the brief gap between the end of TTPP in late 2014 and FDA's inclusion of large cigars in 2016, the cigars at issue here have been subject to fees imposed by the United States continuously for the past fifteen years.

10.     Federal Excise Taxes ("FET") are duties imposed on cigar importers. The calculation of amounts owed by cigar importers is based on the "first sale price" importers charge in an arm's length transaction in the United States.

11.     For the purposes of FET, the first sale price includes TTPP and FDA user fees as well as packaging expenses. 26 C.F.R. § 48.4216(a)-1 (d).

12.     In this way, the fees and taxes are nested such that cheating on one creates a feedback loop that results in further cheating on the others.

13.     As described below, Defendants manipulate and evade each of these related assessments and obligations through several related schemes:

    a.  Defendants use a rotating cast of related and/or controlled companies as importers in order to fraudulently manipulate the fee calculation formulas.

        i.  This fraudulent use of so-called "new" importers is designed to abuse FDA user fees calculation formulas to achieve a zero-dollar assessment in each defendant's first year of business; and

    b.  Defendants reported false and fraudulently low first sale prices that

        i.  were based on sales to related parties – a material violation of the regulations;

        ii.  omitted costs the regulations require be included; and

        iii.  were simply made up and in some cases lower than their cost of goods.

2

## PARTIES

**A.      Relator – AKW Enterprises, LLC**

14.      Relator AKW Enterprises, LLC is a limited liability company organized under the laws of the state of Wyoming.

**B.      Cigar Seller Defendants**

15.      Defendant Fadi Zahran is an individual who, upon information and belief, is domiciled in and a resident of the state of Florida. He is one of the people behind the fee and tax evasion scheme detailed here.

16.      Defendant Salma Zahran is an individual who, upon information and belief, is domiciled in and a resident of the state of Florida. She is one of the people behind the fee and tax evasion scheme detailed here.

17.      Fadi Zahran and Salma Zahran are husband and wife.

18.      Defendant Abdallah Nada is an individual domiciled in and a resident of the state of Florida. He is one of the people behind the fee and tax evasion scheme detailed here.

19.      Defendant Show Cigars, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with an address of 315 Green Ridge, Ste H2, New Castle, PA and registered as a foreign entity in Florida.

20.      Show Cigars is a cigar seller that uses various schemes and frauds to evade the payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

21.      Show Cigars is owned by Defendants Fadi Zahran and Abdallah Nada.

22.      Defendant J & D Enterprises, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania, shares an address with Show Cigars, is registered as a foreign entity in Florida, and serves as a downstream distribution channel for the illicit cigars described herein.

3

23.     Fadi Zahran is the owner and President of J & D Enterprises, Inc.

24.     Salma Zahran is the Secretary of J & D Enterprises, Inc. and an active member of the business.

25.     Defendant Mecca Enterprises, Inc. is a corporation organized under the laws of the state of Florida and serves as a downstream distribution channel for the illicit cigars described herein.

26.     Defendants Fadi Zahran and Abdallah Nada are the owners of Mecca Enterprises, Inc.

27.     Defendants J & D Enterprises and Mecca Enterprises are downstream distribution channels for the illicit cigars described herein.

28.     Collectively, these Defendants are referred to as the "Cigar Seller Defendants".

**C.     Importer Defendants**

29.     Defendant L A Tobacco Inc. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes.  The publicly listed officer for L A Tobacco is Defendant Roger Ors who is related to the other Ors Defendants. In addition, Lazara Ors, another Ors family member, filed the incorporation papers for L A Tobacco.

30.     Defendant LPR Tobacco Importers, Inc. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. LPR Tobacco Importers was brought into existence just as L A Tobacco ceased imports and as the FDA user fee assessment was coming into effect. As part of the scheme described herein, LPR Tobacco Importers failed to remit FDA user fees.

4

31.     Defendant Rao Tobacco Imports Inc. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. The registered agent and officer/director for Rao Tobacco is Defendant Roly Ors, another member of the Ors family. Rao Tobacco Imports was brought into existence just as L A Tobacco ceased imports and as the FDA user fee assessment was coming into effect. As part of the scheme described herein, Rao Tobacco Imports failed to remit FDA user fees.

32.     Defendant Florida Import Export Services Inc. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA imposed fees, and taxes.

33.     Defendant Lazara Ors is associated with and controls Florida Import Export Services and is related to the other Ors Defendants.

34.     Defendant Florida Import Export Services Inc.'s imports will sometimes be recorded under the name Florida Import Export Trading.

35.     Defendant Paramount Imports LLC is a limited liability company organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. The registered agent and officer/director for Paramount Imports is Defendant Abiel Ors, another member of the Ors family.

36.     Defendant Prestige Tobacco Inc. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. The registered agent and officer/director for Prestige Tobacco is Defendant Gadiel Gomez who is business partners with Defendant Roger Ors in an unrelated business known as Optimum Manufacturing Corp.

37.     Defendant South Florida Import & Export Corp. is a corporation organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. The same company processed the incorporation paperwork for South Florida Import & Export Corp. as LPR Tobacco Importers, Inc., another of the above Defendant entities.

38.     Defendant L.J. Imports, LLC is a limited liability company organized under the laws of the state of Florida and one of many importers used by the Cigar Seller Defendants to evade payment of FDA and TTB imposed fees, assessments, and taxes. The registered agent and manager of LJ. Imports is Defendant Lucia Valdivia Arcila, who is related to Defendant Lazara Ors. Lazara Ors's maiden name is Arcila.

39.     The above Defendant entities are all related entities and various members of the Ors family, or their business associates, own and/or control most of them.

40.     Defendant Lazara Ors is an individual domiciled in and a resident of the state of Florida. She is associated with and is believed to control Defendant Florida Import Export Services and she filed the incorporation papers for Defendant L A Tobacco. She is related to Defendants Roger, Roly, and Abiel Ors as well as Defendant Lucia Valdivia Arcila. She is a participant in the fee and tax evasion scheme detailed here.

41.     Defendant Roger Ors is an individual domiciled in and a resident of the state of Florida. He is related to Defendants Lazara, Roly, and Abiel Ors and is listed as the President of L A Tobacco. He is a participant in the fee and tax evasion scheme detailed here.

42.     Defendant Roly Ors is an individual domiciled in and a resident of the state of Florida. He is related to Defendants Roger, Lazara, and Abiel Ors and is listed as the registered agent and officer/director of Rao Tobacco Imports. He is a participant in the fee and tax evasion scheme detailed here.

6

43.     Defendant Abiel Ors is an individual domiciled in and a resident of the state of Florida. He is related to Defendants Roger, Lazara, and Roly Ors and is the registered agent and officer/director of Paramount Imports. He is a participant in the fee and tax evasion scheme detailed here.

44.     Defendant Lucia Valdivia Arcila is an individual domiciled in and a resident of the state of Florida. She is related to the Ors family through Lazara Ors (maiden name Arcila) and is the manager of LJ. Imports. She is a participant in the fee and tax evasion scheme detailed here.

45.     Defendant Gadiel Gomez is an individual domiciled in and a resident of the state of Florida. He has business affiliations with Roger Ors and is the registered agent and officer/director for Prestige Tobacco. He is a participant in the fee and tax evasion scheme detailed here.

46.     Defendant Michael Garcia is an individual domiciled in and a resident of the state of Florida. He is the president and registered agent of Florida Import Export Services, Inc. He is a participant in the fee and tax evasion scheme detailed here.

47.     Defendant Jose Luis Cano is an individual domiciled in and a resident of the state of Florida. He is the incorporator of and is associated with Florida Import Export Services, Inc. He is a participant in the fee and tax evasion scheme detailed here.

48.     Defendant Jose Carlos Gonzalez is an individual domiciled in and a resident of the state of Florida. He is the President and registered agent of South Florida Import & Export Corp. He is a participant in the fee and tax evasion scheme detailed here.

49.     These Defendants are referred to as the "Importer Defendants".

50.     The Importer Defendants are not alleged to have TTPP liability. Their role in the conspiracy began after USDA's TTPP Program ended.

51.     The Importer Defendants are, however, liable for the evasion of FDA user fees and FET described herein.

**D.     Manufacturer Defendants**

52.     Defendant Daniel Sinclair Jr. is an individual domiciled in and a resident of the state of Louisiana. He is one of the people behind the cigar price cheating scheme described below. In particular, Mr. Sinclair, along with Mr. Clement, Ms. Harper and the John Doe Defendants, owns and/or controls Durfort Holdings S.A. which is one of the manufacturers which conspires with the Cigar Seller Defendants and the Importer Defendants to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

53.     Defendant David Clement is an individual domiciled in and a resident of the state of Louisiana. He is one of the people behind the cigar price cheating scheme described below. In particular, Mr. Clement, along with Mr. Sinclair, Ms. Harper and the John Doe Defendants, owns and/or controls Durfort Holdings S.A. which is one of the manufacturers which conspires with the Cigar Seller Defendants and the Importer Defendants to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

54.     Defendant Lisa Harper is an individual domiciled in and a resident of the state of Louisiana. She is one of the people behind the cigar price cheating scheme described below. In particular, Ms. Harper, along with Mr. Sinclair, Mr. Clement and the John Doe Defendants, owns and/or controls Durfort Holdings S.A. which is one of the manufacturers which conspires with the Cigar Seller Defendants and the Importer Defendants to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

55.     John Does 1-20 are individuals who, along with Defendants Sinclair, Clement, and Harper, own and/or control Durfort Holdings S.A. which is one of the manufacturers which conspires with the Cigar Seller Defendants and the Importer Defendants to evade payment of

8

USDA, FDA, and TTB imposed fees, assessments, and taxes. The identities of these additional owners or controlling persons are unknown to Relator.

56.    Defendant Durfort Holdings S.A. is a Panamanian entity that sells large cigars to the Importer Defendants and, ultimately, to the Cigar Seller Defendants.

57.    Durfort Holdings contracts with Defendant Emimar S.A. and Defendant Plataforma Arcoiris S.A. to produce large cigars in the Dominican Republic for sale through the Importer Defendants and, ultimately, to the Cigar Seller Defendants.

58.    Defendant Emilio Alcedo Reyes Vargas is an individual domiciled in and a resident of the Dominican Republic. Mr. Reyes Vargas owns and/or controls Defendants Emimar S.A. and Plataforma Arcoiris S.A. which are two of the manufacturers which conspire with the Cigar Seller Defendants and the Importer Defendants to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

59.    Marlon Ivan Reyes Estevez is an individual domiciled in and a resident of the Dominican Republic. Mr. Reyes Estevez is the son of Defendant Emilio Alcedo Reyes Vargas and a director of Defendants Emimar S.A. and Plataforma Arcoiris S.A. which are two of the manufacturers which conspire with the Cigar Seller Defendants and the Importer Defendants to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

60.    Defendant Emimar S.A. is a Panamanian entity that manufactures large cigars for sale to Importer Defendants and, ultimately, to the Cigar Seller Defendants as part of the below described scheme to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

61.    Defendant Plataforma Arcoiris S.A. is a Panamanian entity that manufactures large cigars for sale through the Importer Defendants and, ultimately, to the Cigar Seller Defendants as

part of the below described scheme to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

62.     Defendants Durfort Holdings S.A., Emimar S.A., Plataforma Arcoiris S.A., and their above-named owners are all a part of the below described scheme to evade payment of USDA, FDA, and TTB imposed fees, assessments, and taxes.

63.     These Defendants are referred to as the "Manufacturer Defendants".

## JURISDICTION AND VENUE

64.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

65.     The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a). The Court has personal jurisdiction over Defendants because they regularly transact business within this District.

66.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c) because Defendants transact business or are found within this District and a substantial part of the events establishing the alleged claims arose in this District.

67.     No allegation in this Complaint is based on a public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, administrative, or General Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source.

68.     Under 31 USC § 3730(b)(2), this Complaint was filed in camera and under seal and shall not be served on the Defendants until the Court so orders.

69.     Under 31 U.S.C. § 3730(b)(2), Relator shall provide the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in its possession referenced in and/or related to the Complaint.

70.     Prior to filing this action, Relator voluntarily provided the information on which the allegations in this Complaint are based to the Government.

## FACTS

### I.     Governing Laws

71.     Tobacco products are subject to specific regulations, fees, and taxes.

72.     Because each of the fees and taxes at issue here are calculated, in part, based on the other fees and taxes imposed, cheating on one causes a feedback loop that results in cheating on all of the fees and taxes.

73.     By cheating on the fees and taxes, Defendants not only evade paying money that rightfully should have been paid to the United States, Defendants also distort the American cigar market, and reap an unfair competitive advantage over their law-abiding competitors.

### A.     USDA Tobacco Transition Program Fees; 2005-2014

74.     In October 2004, the Fair and Equitable Tobacco Reform Act, also known as the "Tobacco Buyout" was signed into law as part of the American Jobs Creation Act of 2004 and is described at 7 C.F.R. § 1463.

75.     USDA administered the program and renamed it the Tobacco Transition Payment Program ("TTPP" or the "Program").

76.     USDA published final TTPP rules on or about May 4, 2005.

11

77.     The Program established the levy and collection of fees on certain manufacturers and importers of tobacco products. The Program set a lifetime maximum of $10.14 billion that would be collected from tobacco manufacturers and importers.

78.     The TTPP was in existence from January 1, 2005 through September 30, 2014.

79.     The Program was administered by the Commodity Credit Corporation (part of the U.S. Department of Agriculture) and set an annual national tobacco assessment. This annual total amount would be collected from all payers and could be adjusted quarterly.

80.     Responsibility for paying the national assessment was in turn divided among the domestic manufacturers and importers of each of several classes of tobacco products.

81.     The basis for this annual division was each class's share of prior year excise taxes.

82.     In this way, the class of product that paid the most excise taxes would also pay the most Tobacco Transition Program fees.

83.     In 2010, cigarette manufacturers and importers were responsible for 96.331 percent of the national assessment and cigars were responsible for 2.783 percent.[1]

84.     Each category's portion of the national assessment was then divided among individual domestic manufacturers and importers according to the market share owned by each.

85.     Market share was determined based on self-reported sales and unit or poundage figures. For cigars, market share was determined based on the self-reported number of cigars "removed into domestic commerce." 7 C.F.R. § 1463.7(c).

86.     The amounts due were calculated by the Commodity Credit Corporation of USDA based on information submitted to it by the market participants. 7 C.F.R. § 1463.7.

_____

[1] Snuff, roll-your-own, chew, and pipe tobacco rounded out the remainder.

87.     Domestic manufacturers and importers, including the Cigar Seller Defendants, were responsible for making the appropriate TTPP payments. 7 CFR § 1463.6.

88.     Program evasion is punishable with multiple civil and criminal penalties referenced at 7 C.F.R. § 1463.10.

**B.     FDA User Fees; 2016 – Present**

89.     In 2009, the Tobacco Control Act[2] gave FDA the authority to regulate the manufacture, distribution, and marketing of tobacco products.

90.     The tobacco User Fee system was established in 2014 and is described at 21 C.F.R. Part 1150.

91.     In 2016, FDA expanded its existing tobacco user fee program to include cigars.

92.     On October 1, 2016, FDA began to assess and collect user fees for large cigars.

93.     Similar to assessments under the old TTPP, FDA's user fees program uses an annual total assessment figure, which is set by statute, allocates responsibility for paying the assessment among the various classes of tobacco products, and then assigns a final quarterly user fee to each of the various market participants.

94.     Unlike the TTPP which relied upon self-reported market share information, FDA uses prior year FET data to determine market share and allocate user fees.

95.     Tobacco user fees are determined using a combination of prior fiscal year and prior calendar year FET payments.

96.     The total amount of user fees allocated to large cigars is based on the prior full calendar year of FET payments made by the large cigar segment of the tobacco marketplace but

---

[2] The full name of the law is the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31. FDA's primer on the law is available at https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/family-smoking-prevention-and-tobacco-control-act-overview.

each individual manufacturer or importer's share of that allocation is based on the FET they paid in the prior fiscal year.

97.    For example, the amount of user fees allocated to large cigars for fiscal year 2020 (which runs October 2019 to through September 2020) is determined by the amount of FET paid by large cigars in calendar year 2018 (which runs from January 2018 to December 2018).

98.    In this way, a class of product that paid more FET in the prior full calendar year, will pay more user fees in the present fiscal year.

99.    User fees are further divided amongst individual payors in each product class in proportion to that payor's percentage of the class FET paid in the prior fiscal year.

100.   Payors whose prior fiscal year share of total class FET is less than 0.0001 percent are excluded from user fees for the current year.

101.   This makes some intuitive sense because tobacco user fees are disconnected from current sales and instead operate as a one fiscal year trailing assessment.

102.   As a practical matter, nominally "new" manufacturers or importers that have no history of paying FET in the prior fiscal year will not be assessed any User Fees in their first year of operation regardless of how many cigars they manufacture or import in the current year.

103.   Instead, new market entrants' user fee assessments will "catch up" in their second year of operation when they will owe user fees for the business they did in their first year.

104.   FDA user fees are calculated by FDA based on information that market participants are required by regulation to provide to FDA. 21 C.F.R §§ 1150.5, 1150.7, 1150.9, 1150.11.

105.   As importers, or entities which own or control importers, the Cigar Seller and Importer Defendants are responsible for paying their assigned share of FDA user fees but have instead evaded the payment of these fees.

14

106.    Despite not having any direct obligation to pay FDA user fees as foreign manufacturers, the Manufacturer Defendants have conspired with the Cigar Seller and Importer Defendants to accomplish this evasion scheme and increase their own sales and revenues as a result.

107.    The Manufacturer Defendants do, however, directly owe FDA user fees to the extent they own or control the Importer Defendants.

108.    As described below, one of the schemes employed by Defendants is to create nominally "new" importers so as to evade the payment of FDA user fees.

109.    This "new" status is itself fraudulent, however, since each of the rotating Importer Defendants are related entities merely continuing the joint business of the Cigar Seller and Manufacturer Defendants and the Importer Defendant they nominally replaced.

110.    The evasion of FDA user fees also operates to evade FET because FDA user fees are included in the first sales price used to calculate FET.

111.    Similarly, reduced FET payments result in subsequent year reductions in FDA user fees because prior year FET is used to calculate FDA user fees.

112.    The civil and criminal penalties for user fee evasion and the submission of false information are set out at 21 C.F.R. § 1150.17.

**C.    Federal Excise Taxes on Cigars**

113.    FET is relevant here because FET evasion is a key component of Defendants' scheme to evade TTPP fees and FDA user fees.

114.    The proper calculation and allocation of both TTPP payments and FDA user fees depends on the accurate and truthful payment and reporting of FET.

115.    As with TTPP and FDA user fees, large cigar market participants like the Cigar Seller Defendants and the Importer Defendants are responsible for paying FET. 27 CFR § 41.40.

15

116.   Customs and Border Protection collects the FET on cigars as an import duty.

117.   For the purposes of FET, cigars are divided into two categories: large and small.

118.   All of the allegations contained herein relate to "large" cigars.

119.   Large cigars are subjected to a FET of 52.75% of the "first sale price" up to a maximum FET of $0.4026 per cigar.

120.   The first sale price is defined as "the price for which the large cigars are sold by the importer."  27 C.F.R. § 41.39. The USDA and FDA fees described in the above two sections are included in the first sale price.

121.   By regulation, packaging and shipping costs are included in the calculation of the first sale price.

122.   The FET itself is not included in the first sale price.

123.   The first sale price must be an arm's length transaction.

124.   If the first sale price it is not made at arm's length, then the FET is calculated using a "constructive price".

125.   The constructive price is "the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary." 26 C.F.R. § 48.4216(b)-2(c).

126.   In other words, FET is calculated as a percentage of the price a bona fide and independent importer charges their domestic customers.

127.   Importers, like the Importer Defendants, cheat on FET by

    a.   Making sales to related parties at artificially low prices;

    b.   By reporting entirely made up and fake prices; and

    c.   By omitting from their reported sale prices various inputs, such as packaging, shipping, TTPP and FDA fees, all of which the relevant regulations require to be included for the purposes of calculating FET.

128. Importers are required to accurately self-report their first sale prices to Customs and Border Protection under 19 U.S.C. § 1484(a)(1).

129. Failure to accurately complete the forms and paperwork required by 19 U.S.C. § 1484(a)(1) constitutes a false claim under 31 U.S.C. § 3729(a)(1)(G).

130. Reductions in FET directly result in reductions of both TTPP fees and FDA user fees.

## II.   The Production of Large Cigars

131. The flow of orders, cash, and products is as follows.

132. A Cigar Seller Defendant contacts Mr. Sinclair or an employee of one of Mr. Sinclair's several companies, often Durfort Holdings, to discuss the manufacture of a large cigar product.

133. Mr. Sinclair, or his entity, and the Cigar Seller Defendant come to an agreement on product specifications and pricing.

134. Durfort Holdings contracts Emimar or Plataforma Arcoiris to actually produce the cigars in the Dominican Republic.

135. In general, Durfort Holdings provides the equipment and Emimar or Plataforma Arcoiris provides the labor.

136. Once completed, Emimar or Plataforma Arcoiris exports the large cigars to the then current and operating Importer Defendant.

137. Crucially, upon information and belief, the Importer Defendants carry no economic risk.

17

138.   In a normal and non-fraudulent import transaction, an independent importer would bear some or all of the risk of the manufacturer incorrectly producing or shipping goods and the buyer (here the Cigar Seller Defendants) not accepting the goods or not making timely payment.

139.   Normally, the importer would have to clear customs and pay FET before receiving payment from their customer.

140.   Instead, upon information and belief, the Cigar Seller Defendants prepay some or all of the transaction before the Importer Defendants make any payments to the government or back to the Manufacturer Defendants.

141.   The Importer Defendant then clears customs using false information and without paying the appropriate fees and taxes and remits payment to Durfort.

142.   Durfort in turn remits payment to Emimar and/or Plataforma Arcoiris.

143.   The Importer Defendant then "sells" the large cigars to a Cigar Seller Defendant, an entity related to the Importer Defendant, for an artificially low price.

144.   As described below, this price is artificially low both because the fee and tax evasion are now "baked in" and because reporting an artificially low or false price is itself a part of the fee and tax evasion scheme.

145.   The Cigar Seller Defendant then makes sales to captive and related distributors such as J & D Enterprises or Mecca Enterprises, or to any number of third-party distributors.

146.   The large cigars are then distributed to retailers, and through them to end users, across the country under one of Show Cigars' various brands.

147.   Show Cigars is able to move an enormous quantity of large cigars at very low prices because of the fee and tax evasion described here.

### III.   Defendants' Unlawful Evasion of FDA User Fees, TTPP Fees, and FET

148.   Defendants have engaged in a number of related schemes all with the intended and actual result of artificially and unlawfully reducing FET, TTPP, and FDA payments.

149.   As a result, Defendants have also been able to charge artificially and unlawfully lower prices and/or reap higher profits.

150.   In this way, Defendants compete unfairly against entities that play by the rules and pay their fair share.

### A.   Defendants Fraudulently Evade FDA User Fees by Rotating Importers

151.   The Cigar Seller Defendants use a rotating cast of related or controlled importers, including, among others, the Importer Defendants, to maintain the artificial and false impression that the importers have no prior year sales and are therefore excluded from FDA user fees for the present year.

152.   This portion of Defendants' scheme abuses the rule that excludes newcomers from paying fees in their first year of operation because FDA user fees are a backwards looking assessment.

153.   By annually stripping the importers of assets and then changing the designated importer – when in fact, the importers are actually a set of revolving related entities and co-conspirators – Defendants fraudulently evade the required fees.

154.   These false-flag companies, including the Importer Defendants, are nothing more than beards attempting to obscure the real importers: the Cigar Seller and Manufacturer Defendants.

19

155.     This portion of the scheme which is orchestrated and directed by the Cigar Seller and Manufacturer Defendants requires and depends on the Cigar Seller and Manufacturer Defendants' control over, or at least conspiracy with, the Importer Defendants.

### B.     Defendants Fraudulently Evade TTPP and FDA User Fees by Cheating on FET and Fraudulently Reporting Artificially Low Prices

156.     The Importer Defendants[5], and the Cigar Seller and Manufacturer Defendants acting through or controlling them, provide materially false information on forms required by 19 U.S.C. § 1484(a)(1) and delivered to CBP.

157.     In particular, Defendants report false first sale prices that are artificially, and in some cases impossibly, low.

158.     For example, in 2016, the Importer Defendants were being charged between 5.5 and 14 cents per large cigar by manufacturers based in the Dominican Republic.

159.     Naturally, the first sale price cannot feasibly be lower than the price an importer is charged by its manufacturer.

160.     Nevertheless, Defendants have reported false first sale prices as low as approximately two cents per large cigar.

161.     The FET percentage of 52.75% is applied to the price the importer charges their first domestic customer.

162.     By misreporting their first sale prices, Defendants reduce the FET due on each cigar.

---

[5] There are no allegations that the Importer Defendants are responsible for evasion of TTPP fees as the Importer Defendants did not begin to participate in the fee and tax evasion scheme until after the TTPP Program ended. The Cigar Seller and Manufacturer Defendants, however, are liable for TTPP fee evasion.

163.    As noted above, artificially and fraudulently low FET payments results in artificially and fraudulently low TTPP and FDA user fees.

164.    To maintain this charade of low prices, Defendants use various schemes.

1.    *False sales create false prices*

165.    One of Defendants' schemes is to utilize related entities, like the Importer Defendants, to stage fake first sales to the Cigar Seller Defendants at artificially low prices.

166.    In this way, Defendants are able to report artificially low first sale prices when in reality the transaction being reported is a fake sale between two related companies.

167.    Then, Defendants are free to resell the cigars for substantially higher prices to their real customers.

168.    These real sales, at higher prices and to actual customers, are the transactions to which the FET should be applied or at least the prices which should form the basis of FET and FDA user fees and as to the Cigar Seller and Manufacturer Defendants TTPP fees as well.

169.    The Cigar Seller and Manufacturer Defendants' relationship(s) with the Importer Defendants is not that of arms-length buyers and sellers.

170.    Instead, these sales, and the reported prices, qualify as "sales not at arm's length" because  "(1) one of the parties [here the Importer Defendant(s)] is controlled (in law or in fact) by the other [the Cigar Seller Defendants], or (2) there is common control, whether or not such control is actually exercised to influence the sale price, or the sales is made pursuant to special arrangements between a manufacturer and a purchaser."  26 C.F.R. § 48.4216(b)-2(c).

171.    Because the first sale price for FET purposes includes TTPP and FDA user fees, any artificial reduction of TTPP or FDA user fees operates to further reduce Defendants' FET obligations.

172.     And, because Defendants fraudulently omit TTPP and FDA fees in their calculations and reports their FET obligations are also fraudulently reduced.

173.     In addition, because TTPP and FDA fees are based on the percentage share of each company's prior year FET, reductions in FET also reduce TTPP and FDA fees in a feedback loop of ever-increasing violations.

### 2.     *Excluded packaging and shipping expenses*

174.     Another of Defendants' schemes to fraudulently reduce the fees and taxes they pay is to exclude packaging and shipping costs from the first sale price.

175.     By regulation, these expenses must be included in the calculation of the first sale price. 26 C.F.R. § 48.4216(a)-1(d).

176.     Defendants fail to include these expenses, thereby artificially decreasing the base cost upon which the FET is calculated.

177.     To perpetrate this scheme, Defendants surreptitiously provide packaging materials to the Manufacturer Defendants so that the price and value of the packaging does not appear in the charges billed by the Manufacturer Defendants to the Importer Defendants.

178.     At times, the Cigar Seller and Manufacturer Defendants accomplish this portion of their scheme by moving money and packaging through other entities owned or controlled by them.

179.     By reporting false first sale prices that omit these costs, Defendants fraudulently evade paying the proper FET and FDA user fees, and as to the Cigar Seller and Manufacturer Defendants TTPP fees as well.

### 3.     *Fake prices*

180.     Finally, at times, Defendants simply report first sale prices that are wholly made up.

181.     As above, fraudulently low first sale prices result in fraudulent evasion of FET and FDA user fees, and as to the Cigar Seller and Manufacturer Defendants TTPP fees as well.

### C.    The Scale of the Evasion

182.    Defendants have imported more than 2.1 billion cigars as part of their conspiracy to evade required fees and taxes.

183.    The below table lists the minimum dates and quantities each of the Importer Defendants "moved" (sold) as part of their conspiracy with the Cigar Seller and Manufacturer Defendants to evade FET and FDA user fees. Each container holds approximately 1.7 million cigars.

| Defendant Name | Dates | Number of Containers | Estimated Number of Large Cigars Imported |
|---|---|---|---|
| L A Tobacco | June 2014 through Oct. 2016 | 120 | 204,000,000 |
| LPR Tobacco Importers | Oct. 2016 through Oct. 2018 | 175 | 297,500,000 |
| Rao Tobacco Imports | Oct 2016 through Oct 2018 | 199 | 338,300,000 |
| Florida Import Export Services | Jan 2017 through Feb 2018 | 75 | 127,500,000 |
| Paramount Imports | Oct 2017 through Oct 2018 | 20 | 34,000,000 |
| Prestige Tobacco | Oct 2017 through Feb 2019 | 67 | 113,900,000 |
| South Florida Import & Export | Sept 2018 through Jan 2020 | 127 | 215,900,000 |
| L.J. Imports | Feb 2019 through Dec 2019 | 130 | 221,000,000 |
| | | | |
| | **Total** | **1,239 Containers** | **2,106,300,000 Large Cigars** |

## IV.    The Importer Defendants' Role

184.    The Importer Defendants have an important role to play in this fee and tax evasion scheme.

23

185.    It is only by injecting the Importer Defendants in between the Manufacturer Defendants and the Cigar Seller Defendants that the Cigar Seller and Manufacturer Defendants are able to execute most of their schemes.

### A.    Rotating Importers

186.    Importer rotation abuses the fact that FDA's user fee program assesses a backwards looking fee – the monies collected this year are for the sales conducted last year.

187.    By changing importers each year and leaving the "old" importer without assets or revenues, Defendants are able to evade paying any FDA user fees.

188.    Without the Importer Defendants, this portion of the scheme simply would not work.

### B.    Fake Prices

189.    Because of their close relationship to the Cigar Seller Defendants, none of the prices charged by the Importer Defendants and paid by the Cigar Seller Defendants are the result of arm's length transactions as required by the law – another component of their fee and tax evasion scheme.

190.    Apparently not satisfied with this unlawful "savings," the Importer and Cigar Seller Defendants also combine to report entirely fictional prices that are at times actually lower than what the Importer Defendants pay to the Manufacturer Defendants.

191.    To execute this portion of the conspiracy, the Cigar Seller and Manufacturer Defendants must have co-conspirators that are willing to charge, or at least report, artificially low sales prices that are at times lower than cost.

192.    The Cigar Seller and Manufacturer Defendants found those willing co-conspirators in the Importer Defendants.

193.    Again, without the Importer Defendants, this portion of the scheme would not be possible.

## C.    Knowledge and Interrelation

194.    There can be no doubt that the Importer Defendants are related to each other and aware of their role in the conspiracy.

195.    As described in the party allegations above, each of the Importer Defendants are related to the others through familial ties, business connections, or both.

196.    Several of the Importer Defendants even list common email addresses and phone numbers in their import records.

197.    For example, import records list the email address for Paramount Imports as prestigetobacco@gmail.com and a phone number of 786-302-4960.

198.    This same email and phone number is used by Prestige Tobacco.

199.    Similarly, South Florida Import & Export lists an email address of flaimportexport@gmail.com and a phone number of 786-245-5743 which is the same email address and phone number used by Florida Import Export Services.

200.    Almost all of the Importer Defendants use one of two customs brokers: Customized Brokers Inc. or Prologix.

201.    Each Importer Defendant is aware of the scheme and their role in it.

202.    If not for the conspiracy outlined here, there would be no cause for the Cigar Seller Defendants to do business with the Importer Defendants or cycle importers generally.

203.    There would certainly be no need for different members of the Ors family, or their business associates, to establish and then abandon new entities each year to perform the same functions for the Cigar Seller Defendants.

204.    Each of the Importer Defendants is an important member of the fee and tax evasion machine and each benefits therefrom.

205.    Each of the individuals listed as Importer Defendants, Lazara Ors, Roger Ors, Roly Ors, Abiel Ors, Lucia Valdivia Arcila, Gadiel Gomez. Michael Garcia, Jose Luis Cano, and Jose Carlos Gonzalez, are themselves key participants in the conspiracy.

206.    Each has established and run, or helped to establish and run, a new corporate entity to take the place of a prior entity as part of the importer cycling scheme.

207.    Each has knowledge, through their close familial and business ties to one another, the Cigar Seller Defendants, and the Manufacturer Defendants, of the existence of the scheme and have taken steps to further and advance the evasion of FDA user fees and FET.

208.    For example, between 2011 and 2018, Defendant Cano owned a tobacco import business know as Cano Tobacco, Inc.

209.    For a number of years, and before the Defendants began their importer cycling scheme, Cano Tobacco, and the Cigar Seller and Manufacturer Defendants all did business with Havana 59 Cigar Company either by using Havana 59 as an importer or a consignee.

210.    In fact, Gitano "Tony" Bryant, the owner of Havana 59, purchased a 10% stake in Cano Tobacco and the Manufacturer Defendants moved many millions of dollars of product through Havana 59.

211.    Defendants stopped using Havana 59 after  Mr. Bryant was charged with failing to pay over $13 million in cigar-related FET.

212.    Almost immediately, Defendant Cano incorporated Defendant Florida Import Export Services to take the place of Havana 59 and began importing cigars for the Cigar Seller and Manufacturer Defendants directly.

26

213.    Also, Defendant Florida Import Export Services is controlled by Defendant Lazara Ors.

214.    As described below, Ms. Ors is an additional and important point of connection between all of the other Defendants.

215.    More generally, each of the individuals listed as Importer Defendants have directed or controlled the reporting of false price information to the government and the refusal and failure to remit FDA user fees and FET.

216.    Each has abused the corporate form and the privilege of doing busines through an entity in an attempt to obfuscate and hide their and their co-conspirators' unlawful acts.

217.    The entities listed as Importer Defendants, Florida Import Export Services Inc., LPR Tobacco Importers Inc., L A Tobacco Inc., Paramount Imports LLC, Prestige Tobacco Inc., Rao Tobacco Imports Inc., South Florida Import & Export Corp., and LJ. Imports LLC, were created for the unlawful purpose of evading FDA user fees and FET.

## V.    The Manufacturer Defendants' Role

218.    Each of the Manufacturer Defendants are liable for the fee and tax evasion and resulting false claims described herein.

219.    The Manufacturer Defendants manufacture and sell large cigars for the American market.

### A.    Manufacturer Defendant Knowledge

220.    The Cigar Seller and Importer Defendants are not the only customers serviced by the Manufacturer Defendants.

27

221.    Indeed, at least one of the Manufacturer Defendants' non-Defendant customers has a "most favored nation" contract under which the Manufacturer Defendants must offer this customer a lower price than any other customer.

222.    Nevertheless, the Cigar Seller and Importer Defendants are able to sell their products for less money and therefore buy from the Manufacturer Defendants an order of magnitude more product than the "most favored nation" customer.

223.    This apparent discrepancy is explained by the lower prices and higher margins the Cigar Seller and Importer Defendants can achieve through their unlawful fee and tax evasion.

224.    Mr. Sinclair and his employees have acknowledged as much.

225.    The Manufacturer Defendants know that the Cigar Seller and Importer Defendants are generating a higher volume of sales by unlawfully evading fee and tax payments.

226.    Because this in turn results in higher sales volumes for the Manufacturer Defendants, the Manufacturer Defendants have deliberately ignored, acted with reckless disregard for, or been willfully blind to the source of the other Defendants' high volume of purchases.

227.    If not for the fee and tax evasion committed by the Cigar Seller and Importer Defendants, the Manufacturer Defendants would not be able to sell as many large cigars.

228.    The Manufacturer Defendants are more than tagalong participants, they actively facilitate the frauds set out here.

**B.      Manufacturer Defendants Help Establish Importer Cycling**

229.    Until approximately 2016, the Cigar Seller and Manufacturer Defendants used Havana 59 as the importer for their fee and tax evasion scheme.

230.    In fact, the Cigar Seller Defendants' relationship with Havana 59 and Mr. Bryant was much deeper than just arm's length importer and seller.

28

231.    For a period of time, Mr. Bryant operated his various businesses out of Defendant Mecca Enterprises' offices in Pompano Beach, Florida and Mr. Bryant introduced himself as a "partner" in Defendant Show Cigars' business.

232.    In any event, the Cigar Seller and Manufacturer Defendants were forced to stop using Havana 59 as their importer when the owner of Havana 59 was arrested on cigar-related tax evasion charges.

233.    The elimination of Havana 59 left a hole in the Cigar Seller and Manufacturer Defendants' joint fee and tax evasion scheme.

234.    To fill that hole, the Manufacturer Defendants turned to a trusted insider, Defendant Lazara (Arcila) Ors.

235.    Defendant Reyes Vargas owns a Florida-based tobacco manufacturer called Heritage Tobacco LLC.

236.    From at least 2014 through 2018, Defendant Lazara Ors was employed by or otherwise affiliated with Heritage Tobacco. In fact, she is listed as the point of contact for certain of Heritage Tobacco's imports.

237.    Also in 2014, Ms. Ors (then still Ms. Arcila) was listed as the registered agent for a Florida company known as Maquinarias M.E. LLC.

238.    Defendant Reyes Vargas's family members Marlon Reyes and Edgar Reyes are officers of Maquinarias.

239.    Marlon Reyes is also a director of Defendant Emimar S.A. and Plataforma Arcoiris S.A., the Panamanian companies Defendant Reyes Vargas owns or controls.

240.    Defendant Lazara Ors provided a ready and trusted connection to the Ors family.

29

241.    Ms. Ors, and various members of the Ors family, began setting up and running the Importer Defendants to replace Havana 59 as the importer portion of the fee and tax evasion scheme.

242.    The Manufacturer Defendants are closely connected to the Importer Defendants through the Reyes and Ors families and their shared business interests.

C.    **Manufacturer Defendants Actively Participate in the Scheme**

243.    As part of the fee and tax evasion scheme, the Cigar Seller and/or Importer Defendants ship packaging materials to the Manufacturer Defendants for incorporation into their final products.

244.    The Cigar Seller and/or Importer Defendants also combine with the Manufacturer Defendants to route payments for packaging through other entities so as to hide the expense from the government.

245.    In this way, the packaging costs can be left "off the books," omitted from the price of the large cigars when they are imported, and also omitted from the false first sale price between the Cigar Seller and Importer Defendants in violation of the law.

246.    The Manufacturer Defendants are aware of this sleight of hand.

247.    Defendants Sinclair and Reyes Vargas also own Adomchin S.A. which produces at least some of the foil pouches used to package Show branded cigars.

248.    In this way, Defendants Sinclair and Reyes Vargas help keep the packaging expenses "off the books" of the importer of record while simultaneously collecting payment for packaging materials through another of Defendants Sinclair and Reyes Vargas's companies.

### D.    Manufacturer Defendants Take Steps to Obscure and Hide the Scheme

249.    In addition to helping establish the importer cycling scheme described here, the Manufacturer Defendants have taken steps to insulate themselves and make it marginally more difficult to uncover the true identities of the Importer Defendants.

250.    It would appear Mr. Sinclair and Mr. Reyes Vargas are using foreign entities they own or control, and other affiliated foreign domiciled entities, to mask their involvement in, and profits from, the fee and tax evasion scheme.

251.    For example, Plataforma Arcoiris does not appear to have any customers other than the Importer Defendants.

252.    It appears as though Plataforma Arcoiris' purpose is to insulate the other Manufacturer Defendants from any obvious connection to the Importer Defendants.

253.    Indeed, before Havana 59 was shuttered, the Manufacturer Defendants exported cigars directly from Emimar S.A. to the Cigar Seller Defendants through Havana 59.

254.    After Havana 59 attracted law enforcement attention and ceased operating the above described importer cycling scheme was brought online.

255.    Only then did the Manufacturer Defendants begin shunting their production through Plataforma Arcoiris so as to further insulate and obscure the involvement of the other Manufacturer Defendants.

256.    In addition, when completing bills of lading and other import-related paperwork, the Manufacturer Defendants will enter variations on the actual names of the Importer Defendants.

257.    In this way, a simple search for records related to any particular Importer Defendant will return artificially low figures.

31

258.    The Manufacturer Defendants are willing and active participants and co-conspirators.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)
### (All Defendants)

259.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

260.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay money to the Government or knowingly and improperly avoids of decreases an obligation to pay money to the Government.

261.    Defendants knowingly and willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to their obligation to pay FDA user fees, TTPP fees, and FET to the Government.

262.    Specifically, for purposes of improperly avoiding or decreasing their obligation to pay or transmit money to the Government, for at least the past six years, Defendants made or presented, or caused to be made or presented, to the United States false or fraudulent records, knowing these records to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

263.    Each form required by 19 U.S.C. § 1484(a)(1) and incorrectly and falsely completed and each report which formed the basis for the calculation of TTPP and FDA user fees is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(G).

264.    The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent records, failed to collect obligations due

from the Defendants, in particular FDA user fees, TTPP fees, and FET, and has been damaged as a result.

265.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, Defendants improperly avoided paying to the United States money that was due and owning in an amount to be determined at trial.

## COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
### (All Defendants)

266.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

267.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the False Claims Act.

268.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

269.    Defendants conspired to submit false records or statements material to their obligation to pay FDA user fees, TTPP fees, and FET.

270.    Defendants did in fact submit false records or statements material to their obligation to pay FDA user fees, TTPP fees, and FET.

271.    As a consequence of their conspiracies, the United States failed to collect obligations due from Defendants, and has been damaged.

272.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, Defendants improperly avoided paying to the United States money that was due and owning in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator on behalf of herself as well as the United States requests the following relief:

A.      A judgment against Defendants, jointly and severally, in an amount equal to all damages due to the United States, including treble damages, under the FCA;

B.      A judgment against Defendants, jointly and severally, for all civil penalties due to the United States for each of Defendants' violations of the FCA;

C.      An order directing that each Defendant, jointly and severally, pay Relator all costs of this action, with interest, including the cost to the United States for its expenses related to this action;

D.      An order directing each Defendant, jointly and severally, pay Relator all reasonable attorneys' fees in bringing this action;

E.      That Relator be awarded the maximum amount of the proceeds of this action as allowed under 31 U.S.C. § 3730, and/or any other applicable provision of law;

F.      That a trial by jury be held on all issues so triable;

G.      An award of pre- and post-judgment interest; and

H.      Such other and further relief to Relator and/or the United States of America as this Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby requests a trial by jury.

Dated:    October 13, 2020

By *Jonathan Kroner*

Jonathan Kroner
Fla. Bar 328677
(Local Counsel)
Law Office Jonathan Kroner
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
(305) 310-6046
jk@FloridaFalseClaim.com

Darth M. Newman
(Lead Counsel, Motion for *Pro Hac Vice* Forthcoming)
The Law Offices of Darth M. Newman LLC
darth@dnewmanlaw.com
1140 Thorn Run Rd, #601
Coraopolis, PA 15108
(412) 436-3443

*Counsel for Plaintiff Relator*